Theodore B. Kolb, Appellee, v. Estate of Abraham Stephens, Deceased, Appellant.

1. APPEALS AND ERRORS—*administration of estates.* R. S., c. 3, § 123, as to appeals from the circuit court to the supreme court, R. S., c. 37, § 25 (Appellate Court Act, § 8), as to the jurisdiction of the appellate court, R. S., c. 37, §§ 212 and 213, as to appeals from the county court, and the Practice Act of 1907, § 118, as to appeals from the circuit court to the appellate court, must be construed together in determining whether an appeal from the circuit court on the allowance of a claim against an estate should properly be taken first to the appellate court.

2. ADMINISTRATION OF ESTATES—*when appeal from allowance of claim should be taken to appellate court.* An appeal from the circuit court on the allowance of a claim against the estate of a deceased person is properly taken first to the appellate court.

3. ADMINISTRATION OF ESTATES—*when sufficient that appeal is perfected by only one of several administrators.* Where a record shows that an appeal from an allowance against an estate was prayed for and granted to administrators severally or jointly, it is immaterial that only one of the administrators perfected the appeal.

4. BILLS AND NOTES—*evidence of absence of consideration.* A person made claim against an estate based on a note of the decedent claimed to have been given for services to be performed as a nurse, and testified to such effect. Numerous witnesses testified that claimant stated that she was working for wages and that she was paid, and letters written by the decedent to her during an absence requested her to return as a favor and not as a matter of right. *Held,* the note was without consideration.

Appeal from the Circuit Court of McLean county; the HON. COLOSTIN D. MYERS, Judge, presiding. Heard in this court at the April term, 1912. Reversed with finding of fact. Opinion filed October 15, 1912. Rehearing denied December 20, 1912. *Certiorari* denied by Supreme Court (making opinion final).

DE MANGE, GILLESPIE & DE MANGE, JAMES W. BOYD, ROBERT HENNING and WELTY, STERLING & WHITMORE, for appellant.

THURMAN, HUME & KENNEDY, S. P. ROBINSON and LIVINGSTON & BACH, for appellee.

MR. PRESIDING JUSTICE THOMPSON delivered the opinion of the court.

Theodore B. Kolb filed a claim in the County Court of McLean County, against the estate of Abraham Stephens, deceased, based upon a promissory note in the words and figures following:

"$25,000. Weston, Ill., Nov. 3, 1902.

On Demand I promise to pay Ella M. Chapman Twenty-five Thousand dollars out of My estate After My Death, the payment of this note Must be paid regardless of will with int. & expenses incurred in collecting the same. A. Stephens.

"For value received. I hereby certify this note was written by Ella M. Chapman by My Request.
A. Stephens."

It is endorsed,—"Dec. 12/04
Received on Within Note
$1,100.00"
"Dec. 12/08
Received on within Note
$700.00.
"Ella M. Chapman"

The note was transferred by Ella M. Chapman to claimant after the death of Stephens, who died December 15, 1908. The administrators filed an affidavit denying the execution and delivery of the note by Stephens. The claim was allowed in the county court and the administrators appealed to the circuit court. At the first trial in the circuit court the jury failed to agree upon a verdict, and at the second trial a verdict was returned in favor of the claimant for $33,995.55 on which judgment was rendered; one of the administrators brings the case by appeal to this court.

The appellee has moved to dismiss the appeal and insists (1) that the appeal should have been taken to the supreme court, and (2) that this court has no jurisdiction because only one of the administrators perfected the appeal.

The appellee contends that because section 123 of chapter 3, of the Revised Statutes provides that appeals shall be allowed from all judgments, orders or decrees of the county court * * * to the circuit court * * * and from the circuit court to the supreme court, that therefore this appeal should have been taken to the supreme court. The act that appellee relies upon was enacted in 1845. Appellate courts were established in this state in 1877. Section 25 of chapter 37 (Rev. Stat. 1911). Section 8 of the Appellate Court Act provides that: "The Appellate Courts created by this act shall exercise appellate jurisdiction only, and have jurisdiction of all matters of appeal, or writs of error from the final judgments, orders or decrees of any of the circuit courts * * * in any suit or proceeding at law, or in chancery other than criminal cases, not misdemeanors and cases involving a franchise or freehold or the validity of a statute."

Section 212 of chapter 37, of the Revised Statutes (Sec. 122 of the County Court Act) provides for appeals from the final orders, judgments and decrees of the county court to the circuit court except as provided in the following section. Section 213 (Sec. 123

of the County Court Act) provides that "appeals and writs of error may be taken and prosecuted from the final orders, judgments, and decrees of the county court to the Supreme or Appellate Court" in certain enumerated proceedings, which do not include the allowance of claims against estates. Section 118 of the Practice Act of 1907 (Sec. 89 of the Act of 1877 as amended in 1879) provides that "Appeals from and writs of error to circuit courts * * * in all criminal cases below the grade of felony shall be taken directly to the Appellate Court, and in all criminal cases above the grade of misdemeanors and cases in which a franchise or freehold or the validity of a statute or a construction of the constitution is involved * * * and in all cases relating to revenue, or in which the State is interested, as a party or otherwise, shall be taken directly to the Supreme Court." These several sections of the statute, contained in the various court acts and the practice act, regulating the taking of appeals and conferring jurisdiction thereover in the supreme and appellate courts, must be construed together. The appellate courts are given general jurisdiction in all appealable cases, except in cases where the right of appeal is limited to the supreme court. Civil cases are reviewed only by appeals or writs of error. Criminal cases are reviewed only by writs of error. The term appeals as used in the Act of 1877 can only be applicable to civil cases. Appeals from the circuit court on the allowance of claims against estates of deceased persons are not within any of the exceptions, in which the supreme court on appeals has primary jurisdiction, without the case being first reviewed by the appellate court.

It was held in Grier v. Cable, 159 Ill. 29, that the Appellate Court Act repeals so much of section 123 of the Administration Act as is in conflict with it. While the allowance of a claim against an estate of a deceased person is a statutory proceeding and not a suit or proceeding at law (Grier v. Cable, 159 Ill. 29)

yet with the exception that written pleadings are not required, it is otherwise conducted in compliance with the rules governing the trial of suits at law and the parties are entitled to a jury as a matter of right.  The universal practice on appeals from the circuit court from the allowance of claims against estates, since the passage of the Appellate Court Act, has been to take the appeal first to the appellate court, and then to the supreme court.  The following cases, Hobbs v. Ferguson's Estate, 100 Ill. 232; Bliss v. Seaman, 165 Ill. 422; Starrett v. Brosseau, 208 Ill. 408; Schell v. Weaver, 225 Ill. 159; Zeigler v. Illinois Trust & Savings Bank, 245 Ill. 180, with many others, show the construction that has been given to the Appellate Court Act, ever since its adoption.  The practice of appealing to the supreme court through the appellate court has become an established rule and is within the reasonable meaning of the several acts when they are considered together.

While only one of the administrators with the will annexed perfected this appeal, the record shows that the appeal was prayed for and granted to them severally or jointly.  The administrator represents the estate.  The fact that there is a coadministrator is not a reason why one of them might not appeal from the judgment against them as administrators.  It was properly taken by one of them in his representative capacity.  The motion to dismiss the appeal is denied.

It is contended by appellant that the note on which the claim of appellee is based was not executed by Abraham Stephens.  There were many witnesses who testified concerning the signature and more witnesses testified that the signature to the note is not his signature than there are who testified it is his signature. The body of the note is all in the writing of the payee, and the record contains a photograph of the note.  The curve of the last line of the body of the note over the signature tends to show that the line was written after the signature was attached, but in the view we take of

the case, it is not necessary to pass upon that question or upon the question of what witnesses were entitled to the greater credit concerning the genuineness of the signature.

Of the many errors assigned and argued by appellant it is only necessary to consider the contention that the note was a gift to the payee and without consideration. The only consideration claimed to have been given for the note were the services rendered to Stephens and his family by the payee. The evidence shows that Abraham Stephens died December 15, 1908, at the age of eighty-one years. His wife died in 1905, and he had no children. Ella M. Chapman is now about fifty-five years of age, a niece of his wife, and had a second husband, who died in 1909, aged eighty-eight years; she had two sons by a first marriage one of whom married a sister of the appellee. In 1900, Ella M. Chapman who lived in New York, came to visit the Stephens' family at their home at Weston, Illinois. The first day she was at the Stephens' home she made inquiry about his affairs and whether Stephens had made a will. After remaining at the Stephens' home a few weeks she returned to New York. In July, 1901, she returned to Weston and remained in the Stephens' household until his death, with the exception of a few weeks in 1904 when she returned to New York for a short time. While at the Stephens' home she did much of the general housework assisted by others and nursed and cared for both Stephens and his wife. Stephens had no need of a nurse except a few weeks in 1906, and a few weeks before his death. The fact is proved beyond a doubt, by the evidence of witnesses who talked with Mrs. Chapman and with Stephens in the presence of Mrs. Chapman at various times from when she first came to the home of Abraham Stephens in 1901, that she was there working for wages and that she was paid. Several witnesses testified that she told them that she could get twenty-five dollars a week at home as a nurse and that that was

what Stephens was paying her; other witnesses testified that she said she was getting twenty dollars a week. Susan A. Blaidsdell testified that Mrs. Chapman said to her in the presence of Stephens first when she came, that Uncle Abe said he would give her as much as she could earn in the east as a nurse, and she guessed she would stay there; Catherine McBroom testified that about a year before Stephens died Mrs. Chapman said that she could get twenty-five dollars at home and that was what she was receiving there; that she had saved her money to pay off a mortgage and that Stephens had paid her $1,000 to pay a mortgage she owed. She told Carrie Hicox that she earned ten dollars a week in New York and that her uncle gave her $1,000 to pay off a mortgage. Fred Squires testified that after the death of Stephens she told him that she had not received any wages for about two years; he asked her what she had been getting and she replied twenty dollars a week. Alice Franklin testified that in 1905, Mrs. Chapman told her that she had only drawn twenty-three dollars of her wages in that year and that she had been economical. Luella Davis, a deaf mute, testified that in a conversation carried on in writing in 1907, that she told her that she was getting twenty-five dollars a week; Sarah Stephens testified that she told her that she married Mr. Chapman for a home and didn't get any, so she went to nursing and got ten dollars a week; that Stephens told her he would pay her what she got at home and she would rather come there than go among strangers. Robert Grady, a nurse, testified that he talked with Stephens in the presence of Mrs. Chapman; that Stephens asked him what he got for nursing and he told him ten dollars a week and his keeping, and Stephens said to him that he ought to have more, that he paid Mrs. Chapman fifteen dollars a week and paid her every week and that after Stephens' death Mrs. Chapman said Uncle Abe always paid her well. Emma Phillips testified that in 1905, before the death of Mrs. Stephens,

Mrs. Chapman told her that she was getting twenty dollars a week and all the money from the butter, eggs and chickens she would raise; Laura McComas testified substantially the same as Emma Phillips. Nettie Graves, a niece of the deceased testified that in 1901, soon after Mrs. Chapman went to Stephens' Mrs. Ella Chapman told her if Uncle Abe would discharge Nellie Chapman, a domestic working there, and pay her, Ella Chapman, in addition the wages he was paying Nellie Chapman, she, Mrs. Ella Chapman, would do all the work and take care of Mrs. Stephens besides; that a man in New York had offered her twenty-five dollars a week to take care of his wife and she came back to work for Uncle Abe because he would pay her the same. She told Mrs. Gloyd, an elder sister of Mrs. Stephens, who asked her if Stephens told her he would pay her twenty-five dollars a week, that Stephens said he would give her what she got at home.

Two indorsements one of $1,100 dated Dec. 12, 1904, and one of seven hundred dollars dated December 12, 1908, are written on the note. There is no proof in the record concerning the $1,100 payment other than the admission of Mrs. Chapman that her uncle gave her that sum. Stephens deposited his money in banks and took certificates of deposit; when he desired to withdraw money he surrendered a certificate or had the money withdrawn indorsed on a certificate.

On December 13, 1908, Mrs. Chapman wrote a letter to the bank that the seven hundred dollars, part of the money she had withdrawn on one of Stephens' certificates, was a loan that he had promised her. Letters written by Stephens to Mrs. Chapman March 18 and 21, 1904, while she was in New York, show that he requested her to come back not as a matter of right that he could demand but as a favor to him. If the note had been given for services to be performed by her, then the letters would not have requested her return as a favor.

While Mrs. Chapman contradicted many of the wit-

nesses who testified concerning her statements, a careful review of all the evidence shows by a manifest and clear preponderance that Mrs. Chapman worked for Stephens by the week for wages. Her statements and the statements of Stephens made in her presence show that she was paid from time to time and that she was working for fifteen to twenty-five dollars per week during all the time she was living at the Stephens home. Her claim that the note was given for services to be performed is shown to be unfounded. The note was given without consideration and was a gift to her. The judgment is therefore reversed with a finding of fact.

*Reversed.*

Finding of Fact. The note in evidence was given without consideration and was a gift from Stephens to Mrs. Chapman and the appellee is not a holder in due course.